**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| In the Matter of the Detention of: | No. 60705-1-II |
| M.Z. | |
| | UNPUBLISHED OPINION |
| Appellant. | |

MAXA, P.J. – MZ appeals the order continuing his involuntary confinement to a less restrictive alternative (LRA) for an additional 180 days. He challenges three findings of fact and argues that the evidence was insufficient to support the trial court's conclusion that he was gravely disabled. We hold that the evidence supports the challenged findings and the grave disability conclusion. Accordingly, we affirm the trial court's commitment order.

FACTS

*Background*

On December 13, 2024, MZ was committed to a 90-day LRA. On February 18, 2025, designated crisis responder Dane Christensen and Rachel Barry, ARNP, petitioned the court for an additional 180-day commitment to an LRA. The petitioners alleged that MZ continued to be gravely disabled. The petition proceeded to a bench trial on February 26, 2025.

*Trial*

At trial, Christensen testified that MZ had been diagnosed with schizoaffective disorder and that the State was asserting that MZ was gravely disabled based on his loss of cognitive or volitional control.

Christensen testified that MZ had been involuntarily detained three times in 2024. During his June 2024 detention, MZ had stabbed himself in the stomach. After being hospitalized for his injury, MZ had attempted to escape the hospital by trying to break a window with an IV pole.

Christensen stated that he evaluated MZ at his residence on February 17, 2025. MZ's hygiene and appearance were unremarkable, and he initially was conversational and pleasant. Although Christensen noted that MZ was periodically irritated during the evaluation, he participated fully and was cooperative and appeared to be oriented.

However, Christensen noted that throughout the evaluation, MZ presented with a disorganized thought process that required frequent redirection to keep him from going off topic. MZ also spoke in a rapid and pressured manner and that became more pronounced as the evaluation proceeded. Christensen stated that MZ's disorganized thinking was evidenced by him responding to questions with information that had no apparent connection to the question.

During the evaluation, MZ referred to having auditory hallucinations, but he later corrected himself and recharacterized this as having intrusive thoughts. MZ would either refuse to talk about or deny topics that could be evidence of distortions of reality or paranoid thoughts. When Christensen asked MZ if he had any magical or special powers, MZ said he did not and that in the past he had made references to such powers as a joke because he knew he was going to be detained regardless of what he said. MZ also denied believing that there was some kind of

"nefarious force" or that he was on "some special quest." Rep. of Proc. (RP) at 512. Christensen testified that he had asked MZ about these things because during MZ's November 2024 detention, MZ possibly was experiencing delusions or distortions of reality. And during a June 2024 detention there had been "a nefarious force reference" that concerned Christensen because it possibly related to the self-harm incident. RP at 512.

Christensen further testified that during the evaluation MZ said that he did not like taking anti-psychotic medications because he believed that they made him psychotic after six months and caused him to hear voices that told him to jump off bridges. MZ referred to this as having intrusive thoughts rather than hallucinations. Christensen noted that although MZ did not reference any specific delusions or paranoia during the evaluation, he still acknowledged episodes of dissociation.

Christensen also testified that MZ's judgment and insight was poor. Christensen noted that MZ had improved during the LRA, but that during the evaluation he appeared to be unable to recognize the progress he had made and insisted that he did not need to continue the LRA. Instead, MZ appeared to believe he had been misdiagnosed and that he had autism rather than schizoaffective disorder. And he insisted that he did not need his medications and would do better if he were only using marijuana or THC[1] in the future.

Christensen concluded that MZ's cognitive control was impaired, noting "manic type symptoms," such as "flight of ideas; poor concentration; . . . kind of a tendency to keep talking; extremely goal-oriented with his thoughts on marijuana." RP at 516. He also concluded that

---

[1] THC – tetrahydrocannabinol acid – is the principal psychoactive ingredient in cannabis. *State v. Crocker*, 16 Wn. App. 2d 731, 733, 483 P.3d 115 (2021).

MZ's volitional control was somewhat, but not substantially, impaired.  Christensen concluded that MZ still was gravely disabled based on impairment of his cognitive and volitional control.

Ultimately, Christensen concluded that a continued LRA still was necessary.  Christensen based his opinion that a continued LRA was necessary largely on (1) the fact MZ had had three detentions in 2024, (2) the fact MZ had been psychotic at the time of some of these detentions, (3) the fact some of his delusions involved very serious health and safety considerations, (4) MZ's insistence that his anti-psychotic medications were harmful, and (5) MZ's insistence that the only drug he needed to take was marijuana.

Christensen stated that it was likely that if the LRA ended MZ would decompensate and start to exhibit more psychotic and delusional symptoms that would impede his ability to participate in his treatment program and "may likely result[ ] in similar incidents as last year when there was three detentions."  RP at 519.  Christensen noted that excessive use of THC had been known to cause paranoia and other mental health symptoms and that it can interfere with psychiatric medications.  Christensen believed that MZ's "belief that [marijuana] is kind of a cure-all" would result in him decreasing the use of the mediations that he is now taking.  RP at 520.

On cross-examination, Christensen testified that initially MZ had stated that he would remain compliant with his medication if the LRA ended, but as they spoke further "it became quite clear that he didn't really think it was necessary or useful."  RP at 521.  Christensen testified that he had communicated with MZ's treatment team and they had also expressed concern that MZ would stop taking his anti-psychotic medication if released from the LRA.  Christensen also testified that MZ had told him that he was still experiencing intrusive thoughts.

MZ testified that if he no longer was subject to the LRA he would continue to live where he was and receive services and that he would continue to take his medication, although one of the medications was going to be stopped by order of his treatment team. He testified that his treatment team and medications had been helpful.

MZ testified and denied planning to use high doses of THC or marijuana if he was taken off of the LRA. He stated that he would use CBD[2] rather than THC and that he planned to use it for his dietary issues and significant weight loss caused by his irritable bowel syndrome. He admitted that he had not yet discussed using CBD with his care coordinator.

MZ also testified that anti-psychotic medications caused intrusive thoughts after six months of use. But he stated that if that occurred, he would switch medications with his provider's guidance rather than stop the medication on his own.

*Trial Court Ruling*

The trial court found that the State had met its burden of establishing a grave disability by clear, cogent, and convincing evidence and extended the LRA for another 180 days.

The trial court stated,

And I am granting that request because, though I do find that [MZ] has made some progress, based on the testimony of Mr. Christensen, it sounds like there is still some manifestations of some symptoms of his diagnosis and also some, I guess I could call it, inconsistency in what he is actually experiencing versus what he is reporting to staff there or, when he is being evaluated, what he is reporting.

And I think the consequences of him not continuing to receive this treatment and being closely monitored by the [treatment] team and the team that he has now would result in, I think, clear safety risk to him based on the behaviors he was exhibiting prior to -- I think the risk is just too high. And given the inconsistencies in what he says he is willing to do versus what he told staff he was willing to do,

---

[2] CBD is a common term for cannabidiol. *Med. Marijuana, Inc. v. Horn*, 604 U.S. 593, 597, 145 S. Ct. 931, 221 L. Ed. 2d 475 (2025). CBD, like THC, is a naturally occurring chemical compound found in the cannabis plant. However, only THC has the mind-altering properties associated with cannabis. *Id.*

I'm finding that there -- this would probably fall under that revolving door sort of situation where, if he is off the LRA and then he stops taking his medication and he starts -- he is saying, here on the record today, CBD; but the witness testified that he repeatedly referenced using marijuana very recently.

So, I think, with those inconsistencies and that risk there, the State has met their burden, and I will grant the request.

RP at 536.

The trial court issued written findings of fact and conclusions of law and a new detention order setting out MZ's LRA conditions. The court's "findings" just summarized the testimony without making any credibility determinations or actually making specific findings of fact. The court concluded that MZ was gravely disabled under RCW 71.05.020(25)(b)[3] and granted the petition to extend his LRA 180 days.

MZ appeals the order continuing his LRA detention.

ANALYSIS

A.  ADEQUACY OF TRIAL COURT'S WRITTEN FINDINGS

As a preliminary matter, MZ observes that the trial court's written findings of fact regarding the evidence are just a recitation of the testimony, not actual factual findings. But he does not assert that remand for corrected findings is required. Instead, he argues that even considering the court's written recitation of the testimony and the court's oral ruling, there is insufficient evidence to support the gravely disabled finding.

We continue to be frustrated with the practice of some trial courts in involuntary commitment proceedings of merely summarizing the testimony as a substitute for actual findings

---

[3] This statute was amended in 2025. Because the amendments did not change the relevant subsection of this statute, we cite to the current version of the statute.

of fact. At the very least, trial courts should make an express finding regarding the credibility of that testimony.

However, the trial court's written findings in conjunction with its oral ruling clearly demonstrate that the court found Christensen's testimony more credible than MZ's testimony. Therefore, we conclude that the written findings are adequate for review. *In re Det. of A.F.*, 20 Wn. App. 2d 115, 124, 498 P.3d 1006 (2021) (concluding that the trial court's written findings of fact, which included summaries of a witness's testimony, are adequate for review because the court's reliance of the State's evidence implies a finding of credibility).

B.      CHALLENGES TO LRA ORDER

1.   Legal Principles

RCW 71.05.320(4) provides that after an initial involuntary commitment period to an LRA, the designated crisis responder may file a new petition for involuntary treatment on various grounds. Relevant here, the petitioner can file a new petition based on the ground that the respondent continues to be gravely disabled. RCW 71.05.320(4)(d).

The term "gravely disabled" is defined as:

> a condition in which a person, as a result of a behavioral health disorder: (a) Is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

RCW 71.05.020(25). Here, the State proceeded under subsection (b).

When a petitioner seeks to prove that a person is gravely disabled under subsection (b), they must show (1) "recent proof of significant loss of cognitive or volitional control" and (2) "a factual basis for concluding that the individual is not receiving or would not receive, if released, such care as is essential for [their] health or safety." *In re Det. of LaBelle*, 107 Wn.2d 196, 208,

728 P.2d 138 (1986). The second requirement may include a showing that "the individual is unable, because of severe deterioration of mental functioning, to make a rational decision with respect to [their] need for treatment." *Id.* (emphasis omitted).

Subsection (b) enables the State to provide the kind of continuous care and treatment that can break "revolving door syndrome," a cycle in which patients repeatedly move from hospitalization to insecure situations, relapse, and then are rehospitalized. *Id*. at 206. Under this framework, the State can intervene before a mentally ill person decompensates and can provide a continuity of care. *A.F.*, 20 Wn. App. 2d at 127.

To this end, RCW 71.05.245(1) requires the trial court to "consider the symptoms and behavior of the respondent in light of all available evidence concerning the respondent's historical behavior." Although the court cannot base its decision entirely on the respondent's prior commitments, "[i]n making a determination of whether there is a likelihood of serious harm in a hearing conducted under . . . RCW 71.05.320, the court shall give great weight to any evidence before the court regarding whether the person has . . . a recent history of one or more commitments under this chapter." RCW 71.05.245(3). For purposes of RCW 71.05.245(3), " 'recent' refers to the period of time not exceeding three years prior to the current hearing." RCW 71.05.245.

In a civil commitment proceeding, the petitioner has the burden of proving that the respondent is gravely disabled by clear, cogent, and convincing evidence. RCW 71.05.310. This standard means that the petitioner must show that the ultimate fact in issue is "highly probable." *Labelle*, 107 Wn.2d at 209.

When reviewing the trial court's decision on involuntary commitment, we consider whether substantial evidence supports the court's findings of fact and whether the findings of

fact support the court's conclusions of law and judgment. *A.F.*, 20 Wn. App. 2d at 125. Substantial evidence is the amount of evidence sufficient to persuade a fair-minded person. *Id.* We view the evidence in the light most favorable to the petitioner. *Id.* But we do not review the court's decision regarding witness credibility or the persuasiveness of the evidence. *Id.*

2. Challenges to Findings

MZ argues that substantial evidence does not support three of the trial court's findings. We disagree.

a. Recent Delusions

In its findings, the trial court stated that Christensen had testified that MZ had denied believing that he was on a special quest but that there had been indications during a November 2024 detention that he experienced this delusion or distortion of reality. The court further stated that the evidence indicated that MZ had "expressed these delusions fairly recently." Clerk's Papers (CP) at 28.

MZ argues that the evidence does not support the assertion that he had recently expressed that he was on a special quest. He contends that during his evaluation he denied having such delusions and that the only evidence was that he last experienced this delusion in November 2024, before his then-current 90 day LRA.

However, Christensen testified that MZ had displayed "overtones of those possible delusions" during a detention in November 2024. RP at 512. The hearing was on February 26, 2025. Delusions experienced a mere three or four months before this hearing could reasonably be construed as fairly recent. Accordingly, we conclude that substantial evidence supports the trial court's conclusion that MZ had experienced this delusion fairly recently.

b.      Marijuana Cure-All

In its findings, the trial court stated that Christensen testified that MZ's current evaluation established that he "believes marijuana is a cure all and can replace the psychiatric meds he is on now." CP at 29. MZ argues that Christensen never testified that MZ believed marijuana was a cure-all that could replace the psychiatric medications that he currently was taking.

After the State asked Christensen what his specific concerns were should MZ start using THC in the manner he had alluded to, Christensen responded, "I think his belief that it is kind of the cure-all would likely result in a kind of decreased need for the prescribed psychiatric medication he's now on." RP at 520. Accordingly, we conclude that substantial evidence supports the trial court's finding.

c.      Actively Occurring Intrusive Thoughts

In its findings, the trial court stated that Christensen testified that during his evaluation that MZ "endorsed having intrusive thoughts that tell him to jump off a bridge sometimes; indicates he said the intrusive thoughts are actively occurring and happened in the past." CP at 29. MZ argues that the court's assertion that Christensen testified that MZ said that the intrusive thoughts were actively occurring was incorrect. But Christensen testified that MZ had told him that he was currently experiencing intrusive thoughts. Accordingly, we conclude that substantial evidence supports the trial court's finding.

3.      Gravely Disabled Conclusion

MZ argues that substantial evidence does not support the trial court's conclusion that he was gravely disabled because the evidence does not establish repeated and escalating loss of cognitive or volitional control. He acknowledges that Christensen was concerned that he would

not get needed care if the LRA ended, but he points out that this evidence relates to the second requirement of RCW 71.05.020(25)(b), not the first requirement.

There was extensive evidence about MZ's loss of cognitive control. Christensen testified that (1) MZ demonstrated a disorganized thought process that required frequent redirection to keep him from going off topic; (2) MZ spoke in a rapid and pressured manner and that became more pronounced as the evaluation proceeded; (3) MZ had a history of intrusive thoughts and delusions and currently was experiencing some intrusive thoughts; (4) MZ insisted on using marijuana, when THC can cause paranoia and other mental health symptoms; and (5) MZ had three involuntary detentions in 2024 that that involved psychosis and delusions. Christensen opined that MZ's cognitive control was impaired because of his "manic type symptoms," such as "flight of ideas; poor concentration; . . . kind of a tendency to keep talking; extremely goal-oriented with his thoughts on marijuana." RP at 516. We conclude that this evidence supported the trial court's conclusion that MZ experienced the loss of cognitive control.

MZ briefly suggests that substantial evidence does not support the finding that he would not receive essential care if released. He points to his testimony that he would continue his treatment and would not discontinue medication without consulting with his treatment team.

But the trial court was not required to accept MZ's testimony as true, and we will not review the trial court's credibility and weight determinations. *A.F.*, 20 Wn. App. 2d at 125. Christensen testified that (1) MZ lacked awareness of his mental health condition and his instead insisted that he autistic; (2) MZ claimed that the anti-psychotic medication actually caused his mental health symptoms; (3) MZ insisted that he did not need his medications and would do better if he were only using marijuana or THC, which could result in MZ discontinuing his medications; and (4) MZ's treatment team was concerned that he would stop taking his anti-

psychotic medication if released from the LRA. We conclude that this evidence supported the trial court's conclusion that MZ would not receive, if released, the care that is essential for his mental health condition.

Accordingly, we hold that the trial court did not err in concluding that MZ was gravely disabled under RCW 71.05.020(25)(b).

CONCLUSION

We affirm the trial court's commitment order.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
MAXA, P.J.


We concur:

_____
LEE, J.


_____
CRUSER, J.